**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| MICHAEL GASS,            ) | |
|                         ) | |
|      **Plaintiff,**       ) | |
|                         ) | |
|      **v.**               ) | **No. 3:07- 0265** |
|                         ) | **Judge Echols** |
| PRUDENTIAL FINANCIAL   ) | |
| INSURANCE COMPANY OF    ) | |
| AMERICA,                ) | |
|                         ) | |
|      **Defendant.**      ) | |

## MEMORANDUM

Plaintiff Michael Gass ("Plaintiff") brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, seeking judicial review of the decision of The Prudential Insurance Company of America[1] ("Prudential") to terminate his long-term disability benefits. The case was originally filed in state Chancery Court, and Prudential removed the action to this Court. (Docket Entry No. 1.) On Prudential's motion, the Court dismissed as preempted by ERISA Plaintiff's pendent state law claim brought under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* (Docket Entry No. 13.)

Defendant timely filed a Motion For Judgment On The Record (Docket Entry No. 16), to which Plaintiff responded in opposition (Docket Entry No. 19). Plaintiff filed an untimely Motion For Judgment On The Record (Docket Entry No. 18), to which Defendant responded in opposition (Docket Entry No. 20). Plaintiff filed his motion after the dispositive motion deadline and did not seek permission from the Court to make the late filing, even after Prudential noted the tardiness of the motion in its response. Because Plaintiff's motion was not filed in compliance with the scheduling Order (Docket Entry No. 15), the Court will deny Plaintiff's motion and focus on the merits of Prudential's motion in reviewing the administrative record.

---

[1]Defendant states it is misidentified in the Complaint as "Prudential Financial Insurance Company of America." (Docket Entry No. 16, Motion at 1 n.1.)

# I. FACTS

Plaintiff worked for several companies as a heating, ventilation, and cooling ("HVAC") technician for a total of twenty-seven (27) years. (AR 232.) The work is considered to be strenuous, involving heavy lifting, constant squatting, and climbing ladders. (AR 162-163.) Plaintiff has a high school diploma and a two-year HVAC degree from a community college. He also served in the military. (Id.) Plaintiff's date of birth is March 2, 1952, and he is currently 56 years old.

Plaintiff last held an employment position with Service Experts Services, Inc. in Nashville, Tennessee. As a benefit of his employment, Plaintiff was a participant under Group Policy No. 91277 issued to his employer and underwritten by Prudential. As set forth in the plan documents, the policy permitted participating employees to obtain coverage for long-term disability ("LTD"). The obligations and responsibilities of the parties to the insurance contract and of any participants or beneficiaries under the policy were set forth in the plan documents. In addition to underwriting the policy, Prudential served as claims administrator and retained discretionary authority to award LTD benefits.

In November 2002 when Plaintiff was 50 years old, he stopped working as the result of knee problems and arthritis. Plaintiff had multiple pre-existing medical impairments, including bilateral shoulder surgeries, a prior left knee surgery, and osteoarthritis of the hands. He also suffered from depression and hypertension and took medication for those conditions. (AR 233.) Plaintiff received ninety (90) days of short-term disability benefits. (AR 54-55.)

Plaintiff also applied for LTD benefits from Prudential. In considering the claim, Prudential relied on the following terms of the plan:

You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

2

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(AR 33 (emphasis omitted).)

Plaintiff sought treatment for his knee condition from V. Douglas Pierce, Jr., M.D., an orthopaedist. On November 11, 2002, Dr. Pierce performed surgery on Plaintiff's right knee (AR 157), and Plaintiff then attended follow-up clinic visits and entered rehabilitation, including physical therapy. Plaintiff used crutches and then a cane to ambulate, and he also was prescribed anti-inflammatory medications. On December 2, 2002, Dr. Pierce anticipated that Plaintiff would return to work eight weeks post-operation. (AR 109, 143-159.)

Plaintiff had had a previous surgery on his left knee. Because he continued to experience post-operative pain in the left knee, Dr. Pierce ordered an MR with contrast, which was done on December 6, 2002. This test showed evidence of possible additional degenerative changes in the medial compartment, but Dr. Pierce did not see any need for specific intervention concerning the left knee. Plaintiff was instructed to continue taking prescribed medication, continue therapy moving gradually into a home exercise program, and engage in activity as tolerated. (AR 152.)

Dr. Vincent Couden examined Plaintiff for Dr. Pierce on January 20, 2003 in follow-up to the right knee arthroscopy done in November 2002. Dr. Couden wrote in his notes that Plaintiff had arthritis symptoms and pain with weightbearing, swelling and crepitation,[2] and occasional sensation of giving way. He encouraged Plaintiff to continue his home exercise program and use a cane. (AR 143.)

Effective February 9, 2003, Prudential approved Plaintiff's claim for LTD benefits through March 31, 2003, contingent on receipt of additional medical records supporting a finding of disability. (AR 57.) Plaintiff began receiving sixty percent (60%) of his monthly salary, or

_____

[2]A grating or crackling sound or sensation, as *crepitation* in the arthritic knee. *Medline Plus® Online Medical Dictionary*, www.nlm.nih.gov/medlineplus/mplusdictionary.html (Merriam Webster 2008).

3

$2,027.98.  Prudential erroneously reported Plaintiff's date of birth as 01/01/1960, which would indicate he was 43 years old, when in fact, Plaintiff was nearly 51 years old.  At that time, Prudential did not require Plaintiff to apply for Social Security disability benefits, as required by the plan.  (Id.) Prudential informed Plaintiff that, if he were awarded Social Security disability benefits in the future, his monthly LTD benefit would be reduced and a retroactive award of Social Security disability benefits likely would result in an overpayment of LTD benefits, which Plaintiff would have to repay to Prudential.  Plaintiff was asked to sign a reimbursement agreement.  (AR 57-59.) It appears that Prudential asked Plaintiff to apply for Social Security disability benefits on September 29, 2003,  (AR 67) and Plaintiff applied as requested.

Dr. Couden again examined Plaintiff on February 18, 2003, in follow-up to the November 2002 right knee surgery.  Plaintiff continued to have pain with prolonged weightbearing and some swelling in the knee.  He reported difficulty with steps and squatting.  Dr. Couden noted Plaintiff "plans for RTW (return to work) 04/01/03[,]" and he stated Plaintiff "has understandable concerns about returning to his job position which involves much climbing of ladders and squatting."  (AR 144.)  Based on the notation that Plaintiff had plans to return to his normal job duties in April 2003, Prudential terminated Plaintiff's LTD benefits effective April 1, 2003.  (AR 60-61.)

Plaintiff returned to the orthopedic clinic on April 15, 2003.  Dr. Pierce observed that Plaintiff's post-operative course had been slow.  Dr. Pierce noted:  "He returned to work for the first time post op yesterday and was only able to work three hours due to pain.  He felt his knee give way and [had] subsequent swelling.  He saw Dr. Guth[3] and was placed on Vioxx 12.5 mg q day."  (AR 148.) Right knee x-rays showed "tricompartmental degenerative disease with progression of medial joint space narrowing compared to films from November last year."  (Id.)  Dr. Pierce discussed treatment options with Plaintiff, including continuing Vioxx and using ice, a knee sleeve, and a cane.

_____

[3]Dr. Robert Guth is Plaintiff's primary care physician.

4

Dr. Pierce noted Plaintiff had received multiple cortisone injections in the past, but they mutually agreed to avoid any more. Dr. Pierce wrote:

> After reviewing Michael's job description from Donelson Air Conditioning, I think it appropriate that Michael consider vocational rehabilitation as I don't think he is going to be able to continue this level of work status with [its] lifting upwards of 50 pounds from the floor over his shoulder on an intermittent basis as well as constant bending, squatting and stooping. He has a good understanding of this and is in agreement. He will go to strict desk work as of today with office recheck [in] four weeks.

(AR 148, 162-163.)

Based on this information and Plaintiff's request for reconsideration, Prudential approved LTD benefits for no more than 24 months, to February 10, 2005, because Plaintiff could not return to his normal occupation. (AR 68, 261.)

Plaintiff returned to see Dr. Pierce on May 16, 2003. Overall, Plaintiff felt that he had improved somewhat, as pain and soreness had decreased to some degree, but he still had soreness and swelling in his knee with activity. Plaintiff reported "he can be up approximately 3 or 4 hours before swelling and pain start to significantly improve."[4] (AR 149.) Plaintiff was unable to tolerate daily use of anti-inflammatory medication due to stomach upset. Nonetheless, Dr. Pierce directed Plaintiff to use anti-inflammatory medication, a knee sleeve and a cane. Dr. Pierce noted: "[G]iven Michael's situation, I think sit-down desk work would be appropriate for him. He has a good understanding of this and agrees." (Id.)

Prudential continued to monitor the Plaintiff's medical progress during the time period in which it provided LTD benefits. As set forth in the LTD policy, Prudential offers a vocational rehabilitation program to help plan participants return to work or transition to another job. (AR 48-49.) The policy provides that "[i]f at any time, you decline to take part in or cooperate in a rehabilitation evaluation/assessment or program that Prudential feels is appropriate for your disability and that has been approved by your Doctor, we will cease paying your monthly benefit."

---

[4]The Court wonders if Dr. Pierce meant "increase," not "improve."

5

(AR 49.)  Prudential invited Plaintiff to participate in the vocational rehabilitation program, but in June 2003, Plaintiff indicated he was not interested because he was writing books and hoped to become a published author.  (AR 220-223, 230, 264.)

Plaintiff visited Dr. Pierce next on July 18, 2003.  He reported he could only be up on his leg two to three hours a day due to pain, and relied more and more on his cane.  He alternated taking two types of anti-inflammatory medication due to gastric distress.   Dr. Pierce discussed treatment options with Plaintiff, suggested that he take only one type of anti-inflammatory medication, and directed him to follow-up with Dr. Guth.  Plaintiff was directed to check back with Dr. Pierce on an as-needed basis.  (AR 150.)  Plaintiff did not see Dr. Pierce again, but visited only his primary care physician, Dr. Guth.  (AR 92, 166-191.)

In late November 2003, Prudential referred Plaintiff to a Social Security consultant, Allsup Inc., of Belleville, Illinois, to represent him during the process of applying for and obtaining Social Security disability benefits.  Prudential paid Allsup's entire fee.  (AR 129-130.)  Allsup provided Prudential with updates on the status of Plaintiff's Social Security disability application.  (AR115-116; 122-125.)

In September 2004, Prudential notified Plaintiff that his initial 24-month period of LTD benefits would expire on February 10, 2005.  (AR 68-69.)  Thereafter, Plaintiff would be entitled to LTD benefits only if Prudential determined that "due to the same sickness or injury, [he was] unable to perform the duties of any gainful occupation for which [he was] reasonably fitted by education, training or experience."  (AR 33 (emphasis omitted).)  The policy defines "gainful occupation" as "an occupation, including self employment, that is or can be expected to provide you with an income equal to at least the benefit percent of your indexed monthly earnings within 12 months of your return to work."  (Id.)  Prudential informed Plaintiff that it planned to conduct a thorough evaluation to determine his eligibility for continued LTD benefits and asked him to have his physician complete the Supplemental Attending Physician's Statement.  (AR 68.)  On January

6

20, 2005, Prudential asked Plaintiff to provide a signed medical authorization and to complete the Comprehensive Claimant Statement. (AR 71-72.)

Plaintiff completed the Comprehensive Claimant Statement on February 2, 2005. (AR 337-339.) He listed the primary conditions for which he was currently being treated as arthritis and pain in his knees, hands, and shoulders, depression, and progression of these conditions. He also reported he had stomach problems (which he attributed to medications and stress), high blood pressure and vertigo. He was taking five or six medications daily. Plaintiff listed his current treatment as medications and doctor visits and said there was "no real change." (AR 337.) He reported that medication eased pain, but asked Prudential to note his handwriting and said his hands still hurt and he needed a cane to walk. Plaintiff described progression of his disease since he stopped working in November 2002, including more pain in his legs and "thumb joints are very bad. Shoulders stiffen hard to lift arms at times – weather effects." Plaintiff claimed physical therapy was cut off by the insurance carrier, and he had not seen Dr. Pierce for a year or so. He explained he stopped seeing a psychiatrist due to concerns about money and lack of progress.

Plaintiff stated that his conditions precluded him from working because he could not stay on his feet more than two or three hours even with a cane and sitting did not help him unless his legs were elevated after a while. He said he participated in church activities and continued to write, but he could not identify any accommodations that would enable him to be employed because he could not work eight straight hours. As to daily activities, he stated that his joints were stiff early and working them loose was painful. Thereafter he would do two or three hours of household chores such as dishes. By then he had to rest his legs and he would write on the computer word processing program. He prepared easy-to-fix foods. He said that he could handle his daily grooming needs, but he had to move slowly and did not usually need assistance. His wife helped him if his hands were too stiff. His hobbies were reading and studying and two-finger typing on the computer. To loosen his hands he would sometimes paint models. (AR 338-339.)

7

On February 7, 2005, Dr. Guth completed a one-page Attending Physician's Statement. (AR 331.) When asked to describe Plaintiff's medical obstacles in returning to work, Dr. Guth wrote, "Pain." He wrote "no" when asked if there were any non-medical factors which had a significant impact on functional abilities. When asked to choose the job category that best described the claimant's functional abilities, Dr. Guth checked the box next to "Sedentary." Under that category, the form contained the preprinted words: "Negligible Weight Mostly Sitting." Prudential requested medical records from Dr. Guth on February 14, 2005. (AR 73.)

Dr. Guth's medical notes from November 2003 and January 2004 showed that Plaintiff continued to take several prescription medications, including an anti-depressant and an anti-inflammatory, and Plaintiff complained of being tired all the time. (AR 166-167.) In April 2004, Plaintiff reported both hands were painful. Plaintiff returned to Dr. Guth on August 19, 2004 and September 20, 2004. While Dr. Guth's handwritten notes are difficult to read, it appears that Plaintiff continued to complain of gastric distress caused by his medications. (AR 168-169.)

On November 10, 2004, Plaintiff complained of painful joints and he was no longer taking Vioxx and was placed on a new medication. (AR170.) Dr. Guth completed a Physical Capacities Evaluation the same day. It appears that this document was initially sent to the Social Security Administration in connection with Plaintiff's application for Social Security disability benefits and Prudential did not receive a copy of it until several months later.[5] Plaintiff was also seen by Dr. Guth on December 15, 2004 and January 24, 2005. (AR 171-172.)

On February 23, 2005, Prudential notified Plaintiff that he did not meet the policy requirements for continued LTD benefits and terminated his LTD benefits, effective February 11, 2005. (AR 74-76.) In explaining the reason for its decision, Prudential wrote:

> According to the Attending Physicians Statement provided by Dr. Guth dated February 7, 2005, he indicates that Arthritis is the primary diagnosis that is preventing you from working. He also notes that Depression and Hypertension are

---

[5]This document will be discussed below.

the secondary diagnoses preventing you from working. Dr. Guth provides restrictions and limitations of the inability to stand, bend, lift, or pull. Dr. Guth did not provide any medical documentation or diagnostic test results that support your restrictions and limitations listed above. . . .

Since we do not have any medical documentation for review to substantiate your claimed impairments, the lack of intensity of treatment does not reflect a severity of complaints or support for diagnosis which were noted by Dr. Guth. However, it would be reasonable that given your prior knee surgery on November 11, 2002, you may have restrictions and limitations of no heavy lifting greater than forty (40) pounds, or prolonged walking or standing for more than six (6) to eight (8) hours at a time. It also would appear that you would have at least sedentary and light work capacity at this time.

(AR 75.)

Prudential also informed Plaintiff that it obtained a Transferable Skills Analysis ("TSA") and Labor Market Study from one of its Vocational Rehabilitation Consultants. (AR 215-218.) The TSA analyzed Plaintiff's job skills and compared them to a list of skills required for a variety of jobs. The TSA determined there were several jobs which utilized his existing job skills and which were within his restrictions and limitations, including Tool Numerical Control Programmer, Dispatcher, Final Assembler, Parts Cataloguer, Classification Clerk, General Inspector, and Adjustment Clerk, ranging in pay from $2,222.50 to $2,327.50 per month. The Labor Market Study showed that such jobs were available within a reasonable commuting distance from Plaintiff's home, and the salaries paid for such jobs were considered to be gainful given Plaintiff's pre-disability earnings of $3,379.97 per month and his LTD monthly payment of $2,027.98. Finding that Plaintiff had the capacity to return to work at another occupation for which he was reasonably fitted by his education, training or experience, Prudential terminated the LTD benefits. Prudential notified Plaintiff that he could appeal within 180 days. (AR 75.)

In July 2005, Plaintiff contacted Prudential by telephone and indicated he wanted to file an appeal and he was working with an attorney. (AR 243.) He stated he had been cooperating with Allsup, but when Prudential terminated benefits, he contracted with Allsup separately to handle his Social Security application. (Id.)

9

In early August 2005, Plaintiff himself sent a letter to Prudential appealing the termination of his LTD benefits. (AR 131.) Plaintiff stated, "nothing has changed significantly over the last two years. The conditions have progressed[.]" (Id..) Prudential acknowledged receipt of Plaintiff's appeal on October 12, 2005, and agreed to reconsider its decision upon receiving updated information. (AR 77.)

It appears that Plaintiff enclosed with his appeal a copy of the Physical Capacities Evaluation Dr. Guth completed on November 10, 2004. In the Physical Capacities Evaluation, Dr. Guth reported that Plaintiff could sit for three (3) hours in an eight (8) hour day and stand/walk one (1) hour. (AR 183.) Plaintiff required the opportunity to alternate between sitting and standing at will throughout the day. Dr. Guth noted that Plaintiff could do simple grasping with both hands, but no pushing and pulling or fine manipulation with either hand. Plaintiff also could not use his hands for repetitive motion tasks such as writing, typing and assembly. Dr. Guth also indicated that Plaintiff could not use one or both feet for repetitive motions as in operating foot controls. Dr. Guth added a handwritten comment: "cannot lift, bend, pull or grab due to pain[.]" Dr. Guth further reported that Plaintiff suffered from pain and that there is a reasonable medical basis for his pain: osteoarthritis of the knees and hands. (AR 184.) Dr. Guth rated Plaintiff's pain as disabling to the extent that it would prevent him from working full-time at even a sedentary position. However, Dr. Guth found that Plaintiff did not have deficiencies of attention and concentration due to pain and/or side effects of medication that would result in a failure to complete tasks in a timely manner. Dr. Guth did not indicate whether Plaintiff's pain was mild, slight, moderate, or severe. (AR 184.) Additionally, Dr. Guth reported that Plaintiff could "never" lift any amount of weight and he could "never" climb, balance, stoop, kneel, crouch, crawl, or reach above shoulder level. (AR 185.) Plaintiff was totally restricted from activities involving unprotected heights, severely restricted from being around moving machinery, moderately restricted from driving automotive equipment, and mildly restricted from exposure to marked changes in temperature and humidity and exposure to dust, fumes, and

10

gases. Plaintiff was found to require the use of a cane or crutches for assistance in weight-bearing and balance. (AR 185.)

Prudential obtained additional medical records from Dr. Guth, which showed that, on February 22, 2005, Plaintiff complained of right shoulder pain and right knee pain. (AR 173.) On September 28, 2005, Plaintiff complained of pain in his hands, shoulders and feet and swelling in his knees. He was able to move his shoulder, but not without pain, and he was unable to grip without pain. He also reported he could not walk too long because of pain in his knees and he had not been able to work. (AR 174.) Dr. Guth prescribed a new medication. On October 25, 2005, Plaintiff reported during a clinic visit that he was unable to tolerate the new medication, as he was "unable to think." (AR 175.)

On November 4, 2005, following a hearing before an ALJ, the Social Security Administration issued a fully favorable decision for Plaintiff finding him disabled since September 15, 2002. (AR 310-312.) Disability benefits were awarded starting in March 2003 (a claimant must be disabled for five months before benefits are paid). Plaintiff received a check for $39,360.00 for the period March 2003 through November 2005, a payment of $4,184.00 for December 2005, and thereafter $1,184.00 per month. (AR 320-325.)

During a February 8, 2006 telephone call with a Prudential representative evaluating the LTD benefits appeal, Plaintiff stated that he had pain in his knees and walked with a cane, and his knees became swollen after being on them two to three hours. He was also unable to sit for long periods of time. His hands were arthritic and he had trouble writing and holding a pen. He could type with two fingers. He reported problems with his shoulders and stated he could not lift his arms. (AR 244.) Plaintiff did not think his depression alone would prevent him from working. He explained that he was still writing for one to three hours a day on his computer, and he had his desk chair beside his recliner so he could put his legs up. He said he had not published anything yet and had a boxful of rejection notices. He still planned to get a literary agent and submit a book he wrote

11

for publication. Plaintiff reported he could do "normal things," that is, activities without a great deal of physical stress, for two to four hours. Because his wife had a herniated disc, they split household chores between them and prepared easy meals. They moved to a one-story house without stairs. Their daughter lived with them and helped out. When asked about his Social Security award, Plaintiff responded that he received over $30,000, but the money was spent. He was receiving about $1,100 per month. The representative informed Plaintiff that Prudential would offset his initial award amount as of April 2003. She also stated that Prudential would send his claim out for a file review by a specialist. (AR 244.)

Prudential sent Plaintiff's file to Ernest Chiodo, M.D., for independent review. Dr. Chiodo is board-certified in Internal Medicine, Occupational Medicine, Public Health and General Preventative Medicine, and Industrial Hygiene. (AR 214.) In a February 17, 2006 report, Dr. Chiodo accepted Prudential's erroneous use of the 01/01/1960 birthdate and assumed that Plaintiff was 46 years old, when in fact Plaintiff was then almost 54 years old. He reviewed the records Prudential sent to him, including medical progress notes of Dr. Pierce, Dr. Couden, and Dr. Guth. Dr. Chiodo determined:

> There is a lack of medical information from March 1, 2005 forward other than hand written notes from Dr. Guth, which are difficult to read. A progress note from Dr. Guth dated 9/22/05 states "*Has not been able to work.*" Based upon prior documentation there may be a continuing limitation from work requiring frequent kneeling or climbing ladders or prolonged standing or walking due to his left knee injury. However, there is no limitation from sedentary work. The lack of limitation from sedentary work is the claimant's admitted aspiration to make a living as an author.

(AR 212.) He noted Dr. Pierce had previously discussed with Plaintiff making a transition from his heavy work to "sit-down desk work." Dr. Chiodo stated he did not have sufficient information on Plaintiff's current medical status to address expected treatment, duration and prognosis. (AR 213.)

On February 28, 2006, Prudential denied reconsideration of its prior decision terminating benefits. The company informed Plaintiff that the medical documentation did not support any limitations from sedentary work, and the Transferable Skills Analysis showed there were sedentary

12

jobs in the relevant labor market that he could do. Prudential asked for a copy of Plaintiff's Social Security disability benefits award letter by March 20, 2006. Plaintiff was again notified that he had 180 days to appeal. (AR 84-87.)

On March 6, 2006, Plaintiff contacted Prudential to complain about numerous errors included in the denial letter, including his date of birth. Further Plaintiff pointed out that Prudential wanted reimbursement for an overpayment after he obtained Social Security disability benefits, yet Prudential had not been paying him under its plan. Plaintiff denied that he had been released to sedentary work. (AR 245.)

Shortly thereafter, Plaintiff submitted a second request for reconsideration. (AR 134.) He provided Prudential with a copy of the award letter he received from the Social Security Administration, and stated "[a]s for your claiming I owe you the settlement that I received from Social Security, you haven't paid me in over a year. We will probably be pretty close to even right now." (Id.) He again complained that Prudential was not using his correct date of birth. (Id.)

Prudential again confirmed its denial of benefits on March 27, 2006. (AR 90-93.) The company reiterated its determination that the medical evidence provided did not support an impairment that precluded Plaintiff from engaging in sedentary work. Prudential explained there was nothing in Dr. Pierce's records indicating a problem with Plaintiff's hands or shoulders and there was no testing or documentation of the need for any upper extremity restrictions or limitations in the medical records from Dr. Guth. Prudential relied on the fact that Plaintiff was released from Dr. Pierce in July 2003, and since that time Plaintiff had been treated only by Dr. Guth. "The frequency and intensity of your treatment does not suggest a severity of a condition that would prevent you from returning to work." (AR 92.) Although Plaintiff suffered from depression, Prudential pointed out that Plaintiff had been taking anti-depressant medication for more than a year before he stopped working, Prudential had already paid 24 months of LTD benefits, and under the plan Plaintiff was not entitled to any additional benefits for mental illness. (AR 93.) Prudential

13

repeated its findings that Plaintiff could do sedentary work and that such jobs were available to him. (Id.)

On March 27, 2006, Prudential notified Plaintiff that it had adjusted benefits in accordance with the non-duplication offset provisions of the group policy and determined that his overpayment was $27,849.06. Prudential asked for reimbursement of the full amount. (AR 94.)

Thereafter, Plaintiff's attorney entered his appearance in the Prudential appeal. (AR 133.) In a letter dated September 7, 2006, he repeated Plaintiff's concern that Prudential and its expert relied on an erroneous date of birth. (AR 136-139.) Further, counsel provided a copy of 20 C.F.R. § 404.1567 defining sedentary work for Social Security disability purposes,[6] and argued that Plaintiff could not do sedentary work as defined, based on the Physical Capacities Evaluation Dr. Guth completed in November 2004, because Plaintiff could only sit three hours and stand or walk one hour in an eight-hour day. Counsel further contended that Plaintiff's work skills were not transferable to other jobs, and he provided additional medical records from Dr. Guth for the period July 2003 to December 2004. Counsel further asserted that Prudential should be estopped from denying benefits because Prudential provided Plaintiff with the services of Allsup and those services resulted in a finding by the Social Security Administration that Plaintiff was disabled.

Prudential sent Plaintiff's file to April Campbell, M.D., who is board-certified in Internal Medicine and Physical Medicine and Rehabilitation. (AR 194-197.) In a report dated October 5,

---

[6]The regulation defines sedentary work as:

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

14

2006, Dr. Campbell observed that the file records did not indicate any specific functional impairments from March 1, 2005 forward. She wrote that,

> given the fact that the records document significant pathology involving both of Mr. Gass's knees and also document subsequent arthroscopic surgical procedures to both knees, it certainly would be reasonable to consider him impaired from activities that require frequent stair-climbing, kneeling, climbing ladders, or prolonged walking or standing.

(AR 195.) Taking note of Plaintiff's correct date of birth, Dr. Campbell concluded that the medical records supported permanent restriction from frequent kneeling, stair-climbing, ladder-climbing, and lifting more than 35 pounds or prolonged standing for more than one hour or prolonged walking for more than one hour due to knee pathology. These restrictions, she opined, would not limit Plaintiff from performing a sedentary job.

On October 31, 2006, Prudential obtained an Updated Labor Market Survey from Jordan Rehabilitation Services that took into account Dr. Campbell's report and the concerns raised by Plaintiff's counsel. The updated survey corrected Plaintiff's birth date, noted his age was then 54, and concluded that Plaintiff was able to perform the essential functions of all job titles noted in the original Labor Market Survey completed on March 7, 2004. Openings for these jobs were found to exist in the local employment market. (AR 201-203.)

By letter dated November 15, 2006, Prudential again denied Plaintiff's request for reconsideration. (AR 101-106.) Prudential acknowledged that the reference in its file that the Plaintiff was not seen by Dr. Guth between July 18, 2003 and December 15, 2004 was in error, as the file did contain Dr. Guth's office notes from January 6, 2004, April 2, 2004, August 19, 2004, September 20, 2004, and November 10, 2004. Relying on its previous determinations, Dr. Campbell's report, and the Updated Labor Market Survey, Prudential upheld its decision to deny LTD benefits. Prudential notified Plaintiff that the decision was final, that there were no further administrative appeal rights, and that he could pursue a lawsuit under ERISA.

15

## II.  STANDARD OF REVIEW

The parties agree that the plan gives Prudential discretionary authority to determine eligibility for benefits.  As a result, this Court must apply the highly deferential "arbitrary and capricious" standard of review.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Evans v. UnumProvident Corp., 434 F.3d 866, 875-876 (6th Cir. 2006).  This standard is the least demanding form of judicial review of administrative action, and Prudential's decision to terminate Plaintiff's long-term disability benefits must "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence."  Baker v. United Mine Workers of American Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

A decision may be arbitrary or capricious if it lacks substantial evidence, reveals a mistake of law, or is made in bad faith.  Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276, 1282 (10th Cir. 2002).  A decision is not arbitrary or capricious if it is rational in light of the Plan's provisions.  Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996).  The "arbitrary and capricious" standard of review "is not, however, without some teeth."  McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).  Deferential review does not mean no review, and deference need not be abject.  Id.  The Court is obligated to review the quality and quantity of the medical evidence and opinions on both sides of the issue, McDonald, 347 F.3d at 172; however, the Court is confined to the record that was before the Claims Administrator.  Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 615 (6th Cir. 1998).   The ultimate issue is not whether discrete acts by the Plan Administrator were arbitrary and capricious, but whether the decision to deny benefits was arbitrary and capricious.  Evans, 434 F.3d at 876.

## III.  ANALYSIS

The Court has carefully reviewed the administrative record summarized in this opinion in the light of factors the Court must or is permitted to take into consideration.  In evaluating this matter, the Court has kept in mind the conflict of interest of Prudential in its roles as claim

16

administrator and benefit provider, as well as the conflict of interest of Prudential's consulting physicians, whom Prudential retained and paid to review Plaintiff's claim file. See Calvert v. Firstar Finance, Inc., 409 F.3d 286, 292 (6th Cir. 2005) (noting claims administrator had clear incentive to contract with individuals who were inclined to find in its favor that claimant was not entitled to long-term disability benefits). The Court concludes that, while these inherent conflicts of interest did influence Prudential to some extent in reaching its decision to terminate the payment of long-term disability benefits to Plaintiff, the administrative record confirms that Plaintiff did not carry his burden to convince Prudential that he was disabled from working in "any gainful occupation for which [he was] reasonably fitted by education, training or experience" to justify his continued receipt of LTD disability benefits. The plan clearly placed the burden of proof of disability on Plaintiff. (AR 45.)

Prudential accepted and considered all of the medical evidence that Plaintiff offered, including the records and opinions of his treating physicians. Dr. Pierce, the orthopaedist who performed surgery on Plaintiff's right knee in November 2002, did not see Plaintiff in the clinic after July 2003. Dr. Pierce agreed with Plaintiff's own assessment that he was not able to return to his heavy job in HVAC work, but Dr. Pierce and Plaintiff agreed that Plaintiff could do sitting desk work. Dr. Pierce encouraged Plaintiff to participate in vocational rehabilitation, but Plaintiff declined when Prudential invited him to participate in its vocational rehabilitation program. Dr. Pierce did not opine that Plaintiff was unable to perform any gainful occupation, as required by the LTD plan.

Dr. Guth was Plaintiff's primary care physician and the only doctor Plaintiff consulted after July 2003 when he stopped seeing Dr. Pierce. Dr. Guth's records did not reveal the results of any objective tests Dr. Guth conducted, or ordered to be conducted, to assess Plaintiff's functional capacity. Dr. Guth's records contain his clinical observations of Plaintiff, as well as Plaintiff's own subjective complaints of pain and limitations expressed to Dr. Guth during clinic visits. The medical

records showed that Plaintiff took various prescribed medications which appeared to help his arthritic condition, but no other treatments were ordered. Although Plaintiff complained of arthritis in his hands, knees, and shoulders, he did not consult a rheumatologist who specializes in osteoarthritis.

In the Physical Capacities Evaluation Dr. Guth completed on November 10, 2004, Dr. Guth indicated that Plaintiff could sit for three hours of an eight-hour day and stand or walk one hour, and that Plaintiff needed to be able to alternate between sitting and standing at will. Dr. Guth also described other limitations on Plaintiff's use of his hands and feet. The document was not fully completed; for instance, Dr. Guth did not give any indication of the severity of Plaintiff's pain, even though he was asked to do so. Dr. Guth did not provide any objective testing support for his determinations. He concluded that Plaintiff was unable to do even sedentary work. Yet, in the Attending Physician's Statement dated February 7, 2005, and completed approximately three months later, Dr. Guth indicated that the job category that best described Plaintiff's ability was "sedentary work" that involved negligible weight lifting and mostly sitting. (AR 73.) In fact, Plaintiff engaged in sedentary work when he typed on his computer at least three hours a day. There is no evidence to support a finding that Plaintiff was unable to sit for most of the day or alternate between standing and sitting.

Prudential was not required to accord special deference to the opinion of Dr. Guth as the treating physician, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); Glenn v. Metlife, 461 F.3d 660, 671 (6th Cir. 2006), but Dr. Guth's opinions, especially in early 2005, were not notably different from the conclusions of Dr. Chiodo and Dr. Campbell in 2006 when they conducted file reviews for Prudential. Dr. Chiodo and Dr. Campbell had appropriate professional backgrounds to evaluate Plaintiff's file. Both of them determined that Plaintiff could do sedentary work. This is consistent with Dr. Guth's finding in early 2005 and Dr. Pierce's opinion in 2003. Prudential did not arbitrarily refuse to credit the reliable evidence that claimant could no longer do

18

his prior heavy work or that Plaintiff suffered from pain. See Nord, 538 U.S. at 834; Smith v. Continental Cas. Co., 450 F.3d 253, 262 (6th Cir. 2006). However, Dr. Guth did not rate the severity of Plaintiff's pain when asked to do so in February 2005, Plaintiff's pain appeared to be helped by prescription medication, and Plaintiff was not under any other type of medical treatment.

The LTD plan permitted Prudential to request a physical examination of Plaintiff at its own expense (AR 33), but the fact that Prudential relied on physician file reviews is only one more factor the Court takes into consideration when deciding if Prudential's decision to terminate benefits was arbitrary and capricious. Calvert, 409 F.3d at 295. Plaintiff did not carry his burden to prove his total disability to Prudential's satisfaction as his impairments were not shown to be severe enough to preclude Plaintiff from engaging in any gainful occupation.

It is disconcerting that Prudential sent Plaintiff to Allsup to obtain an award of Social Security disability benefits, yet Prudential later refused to find Plaintiff disabled under its own LTD plan. Moreover, the payment of Social Security disability benefits allowed Prudential to seek overpayment of the LTD benefits it paid to Plaintiff under the plan.

Plaintiff contends Prudential should be judicially estopped from denying benefits under Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 527-528 (6th Cir. 2003). In Calvert, 408 F.3d at 295, a case subsequent to Darland, the Sixth Circuit stated "we do not believe that Darland intended to apply the principles of judicial estoppel as broadly as Calvert asks us to do here." According to the Sixth Circuit panel in Calvert, Darland discussed the concept of judicial estoppel and "expressed concern about the course of action taken by the plan administrator – i.e., availing itself of the benefits of an SSA award and then ignoring or repudiating that award when denying continued plan benefits." Id. The appellate court pointed out that "*Darland* went on to say, however, that '*though not directly applicable in this case,* the principles of judicial estoppel certainly weigh against Fortis taking such inconsistent positions.'" Id. (emphasis in original). Darland also relied on the Seventh Circuit's opinion in Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998), where the panel said "a

19

decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of . . . [a] claim, *even if it does not provide an independent basis for rejecting that evaluation."* Id. at 756 (emphasis added in Calvert). The Sixth Circuit stated in Calvert:

> [W]hile *Darland* and *Ladd* counsel a certain skepticism of a plan administrator's decision-making on facts such as those at issue here, they do not stand for the proposition, urged by Calvert, that a plan administrator is conclusively estopped from disagreeing with an SSA award whenever the plan benefits from such an award. Accordingly, the Court concludes that, contrary to Calvert's contention, the SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious. The SSA determination to award benefits to Calvert is, instead, just one factor the Court should consider, in the context of the record as a whole, in determining whether Liberty's contrary decision was arbitrary and capricious.

Calvert, 408 F.3d at 295. Consequently, this Court may not hold that Prudential's conduct here, standing alone, requires the conclusion that Prudential's denial of benefits was arbitrary and capricious in light of the SSA award. The SSA award and Prudential's later refusal to reinstate LTD benefits are but factors the Court must consider in its analysis.

In its last November 15, 2006 letter upholding its decision to terminate LTD benefits, Prudential acknowledged that the Social Security Administration had awarded disability benefits to Plaintiff. Prudential stated that it had "conducted a separate, thorough review of all documentation in Mr. Gass' claim to evaluate his eligibility for LTD benefits based on the definition of Disability as outlined above." (AR 105.) Prudential reiterated that in order to be eligible for benefits, "medical documentation must support Disability from performing the duties of any gainful occupation for which you are reasonably fitted by education, training or experience. . . . Based on our review, we have determined that Mr. Gass does not meet the requirements of the LTD policy." (Id.) Prudential went on to say: "Therefore, while we acknowledge the findings of the SSA, our review of the medical evidence as outlined above and in our previous determination letters, does not support a sickness or injury that would have precluded Mr. Gass from performing a gainful

20

occupation as of March 1, 2005." (Id.)  As a result, Prudential upheld its prior determination to deny continuing benefits.

Even considering Prudential's conflicts of interest, the Court cannot find that Prudential acted arbitrarily and capriciously in conducting its own review of the medical evidence and determining, under the definition of disability in the plan, that Plaintiff could engage in sedentary work as of March 1, 2005.  The objective medical evidence supporting total disability was very slim. Prudential took note of its mistake in reporting Plaintiff's date of birth and sought a new physician file review and an updated labor market study using Plaintiff's correct age.  Plaintiff's treating physician and the file review physicians seemed to agree that Plaintiff could engage in sedentary work.  When Prudential denied continuing disability benefits, it provided Plaintiff with several appeals, and in the course of the appeals, Prudential considered all evidence Plaintiff provided. None of it supported a finding that Plaintiff was precluded from working at any gainful occupation.

The Court's role is to consider in the larger picture whether Prudential's ultimate decision to deny benefits was arbitrary and capricious.  Evans, 434 F.3d at 876.  The Court has considered the quality and quantity of all the evidence, the fact that the SSA awarded disability benefits, and Prudential's conflicts of interest.  Having given this case the highly deferential "arbitrary and capricious" review to which it is entitled, Evans, 434 F.3d at 875-876, the Court cannot say, even in light of the conflicts of interest, that Prudential's  reasoning process is not supported by substantial evidence.  See  Baker, 929 F.2d at 1144.

## IV. CONCLUSION

For all of the reasons stated, the Court determines that Defendant's Motion for Judgment on the Record (Docket Entry No. 16) will be granted, and Plaintiff's untimely Motion for Judgment on the Record (Docket Entry No. 18) will be denied.  Prudential's decision to terminate Plaintiff's LTD benefits will be affirmed.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE